IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JULIANA VALENZUELA, : | |
| As the Administratrix of the Estate of : | |
| Joseph Santos, deceased and as the Personal : | |
| Representative of his wrongful death beneficiaries, : | |
| Plaintiff, : | |
| : | |
| v. : | Civil No. 5:20-cv-03638-JMG |
| : | |
| OFFICER JONATHAN R. ROSELLE, : | |
| Individually and in his official capacity as a : | |
| member of the South Whitehall Township Police : | |
| Department, *et al.,* : | |
| Defendants. : | |

## MEMORANDUM OPINION

**GALLAGHER, J.**                                                                            **April 28, 2021**

     While on what was supposed to be a routine patrol, Defendant Jonathan Roselle, a newly sworn police officer for Defendant South Whitehall Township, shot and killed Joseph Santos. Plaintiff Juliana Valenzuela, the administratrix of Santos's estate and personal representative of his wrongful death beneficiaries, brings various claims against the defendants for violating Santos's constitutional rights. Presently before the Court is the defendants' partial motion to dismiss and motion to strike. For the reasons set forth below, the motion will be denied.

**I.    FACTUAL ALLEGATIONS[1]**

     During the early evening of July 28, 2018, Roselle was conducting a routine patrol on Hamilton Boulevard not far from the Dorney Park and Wildwater Kingdom amusement park. ECF No. 1, at ¶¶ 11–12. After a woman passerby reported that a man had "climbed on her car

---

[1] The following summary is based on the factual allegations contained in the amended complaint. For purposes of deciding this motion, the allegations are presumed to be true and are considered in the light most favorable to the plaintiff.

and had slammed his hand on her car window," Roselle responded to the nearby location of the incident. *Id.* ¶¶ 17, 20. There, Roselle saw Santos walking toward him on the shoulder of the road, and he pulled his police vehicle over. *Id.* ¶ 21.

Santos, clearly unarmed, approached the vehicle and "smacked on the driver's side window of Roselle's cruiser." *Id.* ¶¶ 23–24. In response, Roselle drew his firearm and ordered Santos to step away from the car. *Id.* ¶ 24. Instead, Santos "mounted the hood of the patrol car and proceeded to smack the windshield of the cruiser with his hand." *Id.* ¶ 25. Roselle, slightly moving his car forward, continued to order Santos to get off of the car. *Id.* ¶ 26. Using the police's non-emergency channel, Roselle radioed for back-up assistance to help with a potential "mental health" situation. *Id.* ¶ 27. He indicated that he would wait for others to arrive before engaging with Santos. *Id.* ¶ 30. While Roselle was waiting for back-up, Santos "dismounted the hood and approached the passenger side front window" of the police car and began hitting the window. *Id.* ¶ 32. Roselle ordered him to "get away" from the car, and Santos complied by walking away. *Id.* ¶ 33.

At this point, Roselle exited his vehicle. *Id.* ¶ 35. Although Santos was about forty feet away and was facing in the opposite direction, Roselle again drew his gun, pointed it at Santos, and ordered him to return. *Id.* ¶¶ 35, 37–38. Santos began to walk slowly back toward Roselle with "his hands raised in the air," to make it clear that he was "unarmed and posed no imminent threat" to anyone. *Id.* ¶ 38. Roselle then ordered him to "get on the ground." *Id.* ¶ 39. Before Santos complied with that order—and as he was still walking back towards Roselle at a slow pace with his hands in the air—he stated to Roselle, "Don't do it." *Id.* ¶ 40. Without any warning, Roselle then shot Santos five times in the torso and head. *Id.* ¶¶ 41–42.

Following the shooting, Roselle radioed that shots were fired, but he did not report that anyone was hit. *Id.* ¶ 43. Nor did he try to perform any life-sustaining treatment. *Id.* Instead, he stood over Santos and watched him as he was bleeding until another officer arrived about a minute later. *Id.* ¶¶ 43–44. The responding officer questioned Roselle about the location of a weapon, to which Roselle stated, "Dude I think I fucked up . . . I didn't know what to do." *Id.* ¶¶ 45–47. The officer then began to perform CPR on Santos and tried to instruct Roselle, but Roselle failed to meaningfully assist him. *Id.* ¶ 50. Minutes later, paramedics arrived and transported Santos to Lehigh Valley Hospital, where he was pronounced dead at 6:08 p.m. *Id.* ¶¶ 64, 66. The entire encounter was captured on Roselle's body camera, as he had turned it on at an earlier point while on patrol. *See id.* ¶ 15.

Valenzuela subsequently initiated this action bringing claims of excessive force, unconstitutional deprivation of medical care, and assault and battery against Roselle, municipal liability against South Whitehall Township, and wrongful death and a survival action against both defendants.

## II. STANDARD OF REVIEW

A complaint may be dismissed for failing to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the complaint must contain factual allegations that sufficiently "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Facial plausibility means that when accepting the complaint's factual allegations as true and in the light most favorable to the plaintiff, a "reasonable inference" may be drawn that "the defendant is liable for the misconduct alleged." *See id.*

At the motion to dismiss stage, the issue is not whether the plaintiff will prevail in the end but whether the complaint rises to the level that is "sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). The Third Circuit has set forth a three-step framework for determining the sufficiency of a complaint. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court should take "note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678–79). Second, the court must "identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678–79); *see also Iqbal* 556 U.S. at 678 (explaining that courts need not accept as true legal conclusions or conclusory statements unsupported by the facts). Third, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago*, 629 F.3d at 130 (quoting *Iqbal*, 556 U.S. at 678–79).[2] A court must "draw on its judicial experience and common sense" to make this context-specific determination. *Iqbal*, 556 U.S. at 686.

### III. DISCUSSION

The defendants move to dismiss the unconstitutional deprivation of medical care claim against Roselle and the municipal liability claim against South Whitehall Township. Each claim will be addressed in turn below.

#### A. Unconstitutional Deprivation of Medical Care Claim

The defendants first contend that the complaint lacks sufficient factual allegations to state a section 1983 unconstitutional deprivation of medical care claim. ECF No. 6, at 5–6.

---

[2] When deciding a motion to dismiss, courts generally can only consider the allegations contained in the complaint, any exhibits attached thereto, and matters of public record. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

4

To successfully assert a section 1983 claim, a plaintiff must show "a deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008). The constitutional right at issue here is Santos's Fourteenth Amendment right to due process, which Roselle allegedly violated when he deprived Santos of needed medical care.[3]

A police officer's denial of medical care rises to the level of a constitutional violation when the officer acts deliberately indifferent to a serious medical need. *Smith v. Grandsen*, 553 F. App'x 173, 177 (3d Cir. 2014). Deliberate indifference is evaluated under a "subjective standard of liability consistent with recklessness as that term is defined in criminal law." *Id.* (quoting *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003)). A medical need is considered "serious" if it is "so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Hogan v. City of Easton*, No. 04-759, 2004 WL 1836992, at *10 (E.D. Pa. Aug. 17, 2004) (quoting *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). Where a serious need for medical care is ignored or delayed for non-medical reasons, the Third Circuit has found there to be deliberate indifference. *See Smith*, 552 F. App'x at 177.

There is no dispute, here, that Santos had a serious medical need: he was shot five times, including twice in the head. Therefore, the focus of the defendants' argument is on whether the complaint sufficiently alleges deliberate indifference. ECF No. 6, at 6. According to the defendants, the complaint lacks factual allegations to support such an inference. *Id.* For example, the complaint does not allege that Roselle had the training, ability, or equipment to treat multiple gunshot wounds. *Id.* Nor does the complaint show that Roselle was deliberately indifferent to the

---

[3] In their motion to dismiss, the defendants do not appear to challenge the sufficiency of the allegations that the constitutional deprivation was caused by a person acting under the color of state law.

blood loss from the gunshot wounds: he radioed that shots were fired, and paramedics arrived shortly thereafter. *Id.*

Two cases are instructive on this issue. The first is *Sullivan v. Warminster Township*, No. 07-4447, 2010 WL 2164520 (E.D. Pa. May 27, 2010) [hereinafter *Sullivan I*]. In that case, the plaintiff alleged that the police officers had "shot [the decedent] for no reason and that they 'did not immediately render any medical assistance to him." *Sullivan I*, 2010 WL 2164520, at *4. Assuming that the defendants had challenged the sufficiency of these allegations, the court found that they were sufficient to state a deprivation of medical care claim. *Id.* Later in the litigation, the court granted summary judgment for the defendants on this claim because the undisputed record showed that the decedent had been shot at 6:47 a.m., an ambulance was called by 6:48 a.m., officers began CPR on the decedent by 6:50 a.m., and the ambulance arrived by 6:55 a.m. *Sullivan v. Warminster Township*, No. 07-477, 765 F. Supp. 2d 687, 702 (E.D. Pa. 2011). Considering these facts, the court concluded that there was no issue of fact that the defendants did not exhibit deliberate indifference toward the decedent's medical needs. *Id.*

The second case is *Hogan v. City of Easton*, No. 04-759, 2004 WL 1836992 (E.D. Pa. Aug. 17, 2004) [hereinafter *Hogan I*]. There, the complaint contained allegations that the officers shot the plaintiff, left him on the floor to die, "did not attend to his wounds," and "did not have an ambulance immediately available." *Hogan I*, 2004 WL 1836992, at *11. The complaint also noted that the plaintiff's cousin, a police officer in a neighboring township, "entered the residence and attempted to stop [the plaintiff's] bleeding." *Id.* at *4. The court denied the motion to dismiss the deprivation of medical care claim, but later granted the defendants' motion for summary judgment, finding that there was no evidence to support the claim that the defendants exhibited deliberate indifference. *Hogan v. City of Easton*, No. 04-759, 2006 WL 2645158, at

*18 (E.D. Pa. Sept. 12, 2006) [hereinafter *Hogan II*]. The court reasoned that the cousin was "granted access to the residence with little difficulty and within a minute of the shooting," and the ambulance arrived shortly thereafter. *Id.*

While the circumstances of the arrests and shootings are certainly different, the allegations in *Sullivan I* and *Hogan I* are in certain respects similar to those presented here. Importantly, the officers in those cases allegedly shot the plaintiffs and did not render "immediate" care. That was enough for the deprivation of medical care claims to proceed to discovery, even though the claims were ultimately resolved in favor of the defendants at summary judgment. Although the case here may be a close call, the Court will likewise allow the deprivation of medical care claim to proceed to discovery. Many of the issues raised by the parties would benefit from the development of the record. After the conclusion of discovery, the defendants may, if appropriate, renew their arguments with respect to the deprivation of medical care claim.

### B. Municipal Liability Claim

Next, the defendants challenge the factual sufficiency of the section 1983 municipal liability claim, primarily arguing that the only support for the claim is a "laundry list of conclusory allegations." ECF No. 6, at 6–12.

A municipality may be held liable for a constitutional violation if the plaintiff is able to establish a causal connection between the violation and the municipality's policy or custom. *Johnson v. City of Phila.*, 975 F.3d 394, 403 (3d Cir. 2020); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). There are two ways for such claims to proceed. *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). The first way is when plaintiffs point to "an unconstitutional policy or custom of the municipality" that led to their injuries. *Id.* The other way is when the

plaintiffs' injuries were "caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice."[4] *Id.* (quoting *Brown v. Muhlenberg Township*, 269 F.3d 205, 215 (3d Cir. 2001)).

If plaintiffs allege an unconstitutional "policy," then they must identify "an official proclamation, policy, or edict by a decisionmaker possessing final authority." *Id.* An unconstitutional "custom" may be shown where there is a "given course of conduct so well-settled and permanent as to virtually constitute law." *Id.*

In comparison, for a "failure or inadequacy" claim, plaintiffs must demonstrate that the "failure or inadequacy amount[ed] to deliberate indifference on the part of the municipality." *Id.* Deliberate indifference, in this context, means that "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* Typically, "[a] pattern of similar constitutional violations by untrained employees' is necessary 'to demonstrate deliberate indifference for purposes of failure [or inadequacy claims]." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). The pattern of violations places municipal decisionmakers "on notice that a new program is necessary, and '[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Id.* (quoting *Bd of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997)).

---

[4] "We consider allegations of failure to train, supervise, and discipline together because they fall under the same species of municipal liability." *Estate of Roman v. City of Newark*, 914 F.3d 789, 799 n.7 (3d Cir. 2019).

Although a "pattern of violations" is generally necessary, there are limited situations where deliberate indifference may be inferred from a single incident. *Id.* Those situations arise where the "need for training can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.*; *see also id.* at 223–24 ("Liability in single-incident cases depends on '[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." (quoting *Bryan Cnty.*, 520 U.S. at 409)). The hypothetical example proposed by the Supreme Court was that because "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons,' if the city arms the officers with firearms, 'the need to train officers in the constitutional limitations on the use of deadly force' is 'so obvious' that a failure to provide such training could provide a basis for single-incident municipal liability." *Id.* at 223 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)).[5]

Here, not only do the defendants contend that the plaintiff has not identified a specific policy, but they also argue that the allegations relating to custom are mere conclusory statements. ECF No. 6, at 10. The plaintiff responded by suggesting that she did, in fact, specify the unconstitutional policy to support the municipal liability claim. ECF No. 9-1, at 7–16. But none of the allegations cited by the plaintiff identify an official municipal proclamation, policy, or edict. Nor do they suggest a specific custom that is "so well-settled and permanent as to virtually constitute law." Instead, the allegations seem rooted in a failure to train theory of liability.

With respect to a failure to train theory, the defendants again maintain that the complaint is "replete with conclusory," not factual, allegations. ECF No. 6 at 10–12. Though the Court

---

[5] Under both the "policy or custom" and "failure or inadequacy" theories, there is also a causation requirement. *Estate of Roman*, 914 F.3d at 798; *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 226 (3d Cir. 2014).

9

agrees that many of the complaint's allegations are either legal conclusions or conclusory statements, the plaintiff has included sufficient factual allegations to plausibly state a failure to train claim under the single-incident theory. Specifically, the plaintiff alleges that Roselle admitted immediately after the shooting that he "didn't know what to do," suggesting that the municipality may not have trained its officers on the constitutional limitations of the use of deadly force. Moreover, the need for training on deadly force in scenarios such as those faced by Roselle may be "so obvious" that the failure to do so can be inferred as deliberate indifference. Notably, the Supreme Court's single-incident hypothetical—that city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons, and therefore need to train officers in the constitutional limitations on the use of deadly force—is not all that different from the scenario presented here. Based on these allegations, the Court concludes that the plaintiff has sufficiently alleged a municipal liability claim against South Whitehall Township.[6]

## IV. CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss is **DENIED.** An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

---

[6] In addition, the defendants' moved to strike certain allegations related to the municipal liability claim. ECF No. 6, at 12–13. That request was dependent on the success of the defendants' effort to dismiss the claim. Because the Court has determined that the municipal liability claim will survive, the motion to strike is now moot.